UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Crim. No. 17-158 (JRT/BRT) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| John Edwin Kuhnel, | |
| Defendant. | |

---

Miranda Dugi, Esq., United States Attorney's Office, counsel for Plaintiff.

Robert M. Paule, Esq., Robert M. Paule, PA, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

Defendant John Edward Kuhnel was charged with one count of possessing child pornography as a person previously convicted of sexually abusing a minor. (Doc. No. 1, Criminal Complaint); *see* 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2). On August 7, 2017, Defendant moved to suppress evidence seized following a warrantless search of his car on or about November 29, 2016. (Doc. No. 20.) This Court held a hearing on this motion on September 14, 2017. (Doc. No. 31.) At the hearing, former Hennepin County probation officer Brian James testified about how he monitored Defendant's online activities as a condition of Defendant's supervised release, which led to the search of Defendant's car and the recovery of two laptop computers. (Doc. No. 35, 9/14/17 Mot. Hr'g Tr. (hereinafter "Tr.") 6–64.) The Government also introduced three exhibits:

(1) records from Defendant's criminal case in Hennepin County, Case Number 27-CR-10-6587; (2) conditions of Defendant's supervised release, effective from 9/2/14 through 9/2/24; and (3) a Hennepin County search warrant application, search warrant, and return. (Doc. No. 40, Exhibit List, Gov't Exs. 1–3.) Defendant offered one exhibit, a Uniform Case Report for Defendant issued by Hennepin County Adult Field Services. (*Id.*, Gov't Ex. 1.)

Based on the evidence presented at the hearing, and for the reasons detailed below, this Court recommends that Defendant's Motion to Suppress Evidence Seized Without a Warrant (Doc. No. 20) be denied.

## I.   Factual Background

### A.   Defendant's Conviction, Revocation, and Conditional Release Period

In 2010, Defendant pled guilty to second degree criminal sexual conduct in Hennepin County. (Tr. 7; Gov't Ex. 1.) Defendant engaged in sexual contact with his three-year-old daughter and masturbated in her presence. (Tr. 9; Gov't Ex. 1 at 9–10.) Defendant's sentence was stayed for five years, subject to conditions of supervision, and Defendant served eighty-eight days at the Hennepin County Workhouse. (Tr. 9.) Defendant, however, violated his conditions of supervision by using alcohol and other controlled substances. (*Id.* at 11, 25.) The stay was therefore revoked and Defendant was given an executed sentence of thirty-six months. (*Id.* at 11.) Defendant served two-thirds of that sentence in prison, minus credit for time served, and the last year was considered good time credit, which he served on supervised release, commonly called parole. (*Id.* at 14, 49.) Concurrent to the beginning of the supervised release term, Defendant began

serving a mandatory ten-year conditional release period pursuant to state statute. (*Id.*); Minn. Stat. §§ 609.343, subd. 2(c), 609.3455, subd. 6. Defendant was released from prison on September 2, 2014, and his conditional release period was projected to expire on September 2, 2024. (Tr. 17–18; Gov't Ex. 2.)[1]

### B. Officer Brian James

Brian James is currently a United States Probation Officer, a position he has held since December 2016. (Tr. 6.) Prior to that, Officer James was a probation officer for over ten years with Hennepin County. (*Id.*) During the last four years of his time with Hennepin County, Officer James worked in the sex offender unit, supervising sex offenders such as Defendant. (*Id.* at 6–7.) Officer James supervised Defendant for about a year and a half, from the summer of 2015 until he left Hennepin County in December 2016. (*Id.* at 18.) Officer Mark Walz supervised Defendant before Defendant was transferred to the supervision of Officer James. (*Id.*)

### C. Defendant's Release Conditions

Upon his release from custody on September 2, 2014, Defendant was subject to a variety of standard and special conditions of release. (*Id.* at 17–19; Gov't Ex. 2.) Any "request to restructure the conditions of release" were required to be "submitted in writing by the offender to the agent/designee." (Tr. 26; Gov't Ex. 2 at 2.) His Conditions

---

[1] The printed version of Defendant's Conditions of Release, the one that Defendant signed, provides that the conditional release period ends on August 31, 2025. (*See* Gov't Ex. 2 at 1; Tr. 51.) Officer James explained that when "an individual is done with the supervised release portion of their sentence, in this case the last third, the last year of the 36-month sentence, the DOC recalculates their termination date and sends that to the supervising agent. At that point I would have written [the date 9/2/24] on there." (Tr. 48.)

3

of Release stated that "[t]he Executive Officer of Hearings and Release or designee will have the final authority to grant or deny restructuring of the above conditions of release and any such changes will be set forth in writing." (Tr. 26; Gov't Ex. 2 at 2.) None of the special or standard conditions were ever altered during the term of Defendant's conditional release period. (Tr. 26.) Defendant signed the document on August 27, 2014, certifying that he "fully understand[s] all the rules, regulations and conditions in this document" and that he "received a copy of the document." (Tr. 27; Gov't Ex. 2 at 1.)[2] Defendant was subject to these conditions in 2016. (Tr. 67.)

Standard Condition No. 13 provides that the "offender will submit at any time to an unannounced visit and/or search of the offender's person, vehicle or premises by the agent/designee." (Tr. 26; Gov't Ex. 2 at 2.)

Special Condition No. 2 provides: "Must not purchase or possess or allow in his or her residence . . . sexually explicit materials, nor enter an establishment that has sexual entertainment as its primary business as determined by the agent/designee." (Tr. 19; Gov't Ex. 2 at 1.)

Special Condition No. 3 provides: "Must not own or operate any device that allows for Internet capabilities or access to the Internet through any technology or third party, call sex/chat/dating or social lines without documented approval of the

---

[2]  Officer James was not present when this document was executed by Defendant, but Officer James discussed the terms with Defendant when he began supervising Defendant, and the terms were a frequent topic of discussion during the course of the supervision period. (Tr. 27–28.)

4

agent/designee. If Internet access is approved by the agent, must not access sex/chat/social/dating web sites/blogs without prior approval of agent/designee." (*Id.* at 19–20; Gov't Ex. 2 at 1.) Examples of forbidden services include Facebook, Twitter, Instagram, Tinder, or Craigslist. (Tr. 20–21.) The concern with these services is that it is very difficult to monitor whether there is any inappropriate activity, such as contacting someone who is underage, and also the temptation involved with their use. (*Id.*) Defendant did not have permission to use these sites. (*Id.* at 20–21.)

Special Condition No. 8 provides: "May not create/use any media method for personal contact and/or advertisement for solicitation purposes without prior written approval of the agent/designee. If Internet access is approved by agent, must not access sex/chat/social/dating websites/blogs without prior approval of the agent/designee." (*Id.* at 21; Gov't Ex. 2 at 1.) Once again, Defendant did not have permission to use social media/sex/chat/dating websites, including Facebook or Craigslist. (Tr. 21.)

Defendant had permission to use electronic devices that could access the Internet, but under very strict conditions. (*Id.* at 21–22.) Defendant was allowed to have a phone that was monitored under a program called WebWatcher, which allowed Officer James to see what Defendant was doing on that phone. (*Id.* at 22.) Defendant was also authorized to use a work computer, but not for personal reasons, and not for sites such as Facebook or Craigslist. (*Id.*) Defendant was also required to give Officer James all of his various access codes and passwords so Officer James could inspect Defendant's use of his phone. (*Id.*) On numerous occasions, Defendant sought authorization to use more devices and websites, such as Facebook, from Officer James. (*Id.* at 23–24.) Officer James did not

5

grant these requests because Defendant had a history of impulsive behavior, and monitoring Defendant's online activities was difficult. (*Id.*) As of November 2016, Defendant was not permitted to use a computer or other electronic device for personal use, other than the approved items mentioned above. (*Id.* at 24–25.)[3]

### D. Defendant Violates His Release Conditions, Leading to the Discovery of Child Pornography on a Laptop Computer in Defendant's Possession

In the summer and fall of 2016, Defendant was working in information technology services, a field in which Defendant had prior experience. (Tr. 28–29.) Officer James was concerned about this arrangement due to the internet restrictions in Defendant's release conditions. (*Id.* at 29.) During this time, Defendant was permitted to use a computer for work in addition to his monitored cell phone. (*Id.* at 30.) Defendant's conditions, including the monitoring of his accounts and phone, were necessary to allow Defendant to continue in this employment. (*Id.* at 29.)

On June 21, 2016, the monitoring system on Defendant's cell phone detected selfie pictures of Defendant's genitals. (*Id.* at 30.) Officer James confronted Defendant about this violation. (*Id.* at 31.) Defendant admitted to the violation, and Officer James understood that Defendant was addressing the situation with his counselor in a treatment setting. (*Id.*)

In November 2016, Officer James noticed several red flags in terms of Defendant's online activities, such as possible access to Facebook, Craigslist, and

---

[3] Defendant "may have been allowed to use a computer at the Workforce Center library, but nothing beyond that." (Tr. 23.)

Twitter. (*Id.* at 31–32.) Defendant's email account, for example, suggested that he had sent a message to a female on Craigslist offering to "entertain her" while she was visiting from out of town. (*Id.* at 32.) Due to the suspected increase in activity, Officer James asked Defendant to bring his phone to the office for inspection to determine how Defendant was accessing these sites. (*Id.* at 33.)

Defendant reported to Officer James on November 29, 2016. (*Id.* at 34.) Officer James confronted Defendant with his concerns regarding Defendant's compliance with conditions. (*Id.*) Defendant admitted to using Facebook. (*Id.*) Defendant explained that he was using it to "increase prosocial networks," and that he used it exclusively on his work computer because having it on his phone would be too much of a temptation. (*Id.*) This admission was significant because Defendant was not supposed to be on Facebook on any device, and Officer James surmised that Defendant was misusing his work computer. (*Id.*) Defendant denied contacting anyone on Craigslist, but after Officer James showed Defendant the messages, Defendant wavered, saying "maybe I did contact someone," and then tried to minimize his use. (*Id.* at 35.) Defendant also admitted to using alcohol as a social activity with other members of his kickball league. (*Id.* at 36.) Defendant portrayed his use as responsible and stated that he did not drive after consuming alcohol. (*Id.*)[4]

---

[4] Standard Condition No. 5 prohibits the use or possession of alcohol and other controlled substances. (Tr. 25; Gov't Ex. 2 at 2.) Defendant's prior probation violations involved the use of alcohol, and one of Officer James's co-workers had observed Defendant using alcohol, so Defendant's compliance with this condition was an ongoing concern. (Tr. 25–26.)

7

After this discussion, Officer James asked Defendant to accompany him to Defendant's car to search for Defendant's work computer. (*Id.* at 36–39.) Officer James wanted to retrieve the work computer because of the inconsistencies between what Defendant was telling him and what he was seeing on the accounts. (*Id.* at 37.) His aim was to "settle the open questions" about "what [Defendant's] Internet activity had been." (*Id.*) Officer James believed Defendant violated his conditions regarding Internet activities, and Officer James wanted to determine the extent of the violations. (*Id.* at 37–38.) Defendant did not object, argue, or put up any resistance. (*Id.* at 36–37.)

Defendant, Officer James, and two other probation officers, Mark Walz and Annette Mauer, went to Defendant's car, which was parked next door in a parking ramp. (*Id.* at 36.) Defendant opened the car. (*Id.* at 38.) The officers asked Defendant if he had any electronics inside; Defendant responded that there was a work computer. (*Id.*) The officers seized a black pull-string bag that contained two computers, not one. (*Id.* at 38–39.) Officer James testified: "I believe he actually retrieved that for us. He might have just indicated where it was." (*Id.* at 38.) The additional computer was a surprise to the officers. (*Id.* at 38–39.) Defendant indicated that it was a client's computer from work, and he had to bring it home to work on it. (*Id.* at 39.) The work computer was a Lenovo Thinkpad, and the "client computer," which was larger, was an HP Pavilion. (*Id.*)

The officers told Defendant that they were going to look through the two computers along with Defendant's phone. (*Id.*) Defendant did not object or protest. (*Id.* at 40.) Defendant provided the password to his work computer, which contained the initials of his daughter, who was the victim of the underlying offense in Defendant's case. (*Id.*)

8

Officer James told Defendant that he needed to report to his office the following day, and if everything "checked out," the computers could be returned to him. (*Id.* at 40–41.) Officer James planned to review both computers, confer with Defendant's employer, and "double-check to make sure everything was as he said it was." (*Id.* at 41.)

Officer James and the other officers returned to his office with the computers. (*Id.*) Officer James gave the Lenovo Thinkpad to Ryan Ruzich, a specialist in forensic search of technology. (*Id.*) Officer James opened the HP computer, and the screen was open to Defendant's Facebook account, which was the same Facebook account Officer James had seen earlier in November. (*Id.*) Officer James immediately thought that Defendant was being deceptive because this computer was supposed to have been a client computer. (*Id.* at 42.) At this point, Officer James surmised that there was a violation for possession of an unauthorized device, and he would be forwarding this computer to the specialist for further review. (*Id.* at 42–43.) Officer James then minimized the Facebook page and noticed some picture files on the desktop. (*Id.* at 43.) Officer James opened one of the files, which contained adult pornography, which was also a violation. (*Id.*) Officer James also noticed a minimized page with an open Gmail account; Officer James identified this account as the e-mail account he suspected Defendant had been accessing. (*Id.* at 43–44.)

Officer James turned the HP computer over to Ryan Ruzich for a full forensic report. (*Id.* at 44.) This involved running a program that examines the computer to determine its use and content. (*Id.*) During this process, Mr. Ruzich saw child pornography, and he shut the computer down. (*Id.*) Mr. Ruzich contacted the Minneapolis Police Department because the situation had crossed the line between a violation of

Defendant's supervision and possible criminal activity. (*Id.* at 45.) Minneapolis police took custody of the computers and obtained a warrant to search them on December 13, 2016. (Gov't Ex. 3.) Police found no child pornography on the work computer, but did find numerous images containing child pornography on the HP Pavilion "client computer." (Doc. No. 42, Gov't Suppl. Br. in Opp'n to Def.'s Mot. to Suppress ("Gov't Suppl. Br.") 9; Doc. No. 27, Gov't Resp. to Def.'s Pretrial Mots. ("Gov't Resp.") 4.)

Defendant did not, as directed by Officer James, report to probation on November 30, 2016. (Tr. 45.) A warrant was obtained for his arrest. (*Id.* at 46.) Through Defendant's e-mail account, Officer James was able to determine that Defendant first went to southwest Minnesota, and then to Sioux Falls, South Dakota. (*Id.*) Defendant was eventually arrested in Colorado. (*Id.*)

On November 30, 2016, Officer James spoke to Plaintiff's supervisor, Mark Sommerfeld. (*Id.*) Officer James confirmed that Defendant had the Lenovo as a work laptop. (*Id.* at 47.) Mr. Sommerfeld did not know why Defendant had the second computer. (*Id.*) Later, Mr. Sommerfeld confirmed that the HP Pavilion computer did not belong to a client. (*Id.*) Officer James did not receive any information to suggest that the HP Pavilion computer seized from Defendant belonged to a third party. (*Id.*)

## II.     Analysis

Defendant argues that the warrantless search of his vehicle, resulting in the seizure of two computers,[5] violated the Fourth Amendment because there was no reasonable suspicion to justify the search. (Doc. No. 41, Def.'s Mem. in Supp. of Mot. to Suppress ("Def.'s Mem.") 2–5.) The Government argues that the search of the vehicle was supported by reasonable suspicion. (Gov't Suppl. Br. 11–16, 19–23.)

### A.     Defendant's Expectation of Privacy Was Diminished Because He Was on Conditional Release

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. An individual asserting Fourth Amendment rights "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) (citing *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)).

Defendant was on conditional release when his car was searched. Thus, Defendant's expectation of privacy is more limited than that of the average citizen. *See United States v. Knights*, 534 U.S. 112, 119–20 (2001) (discussing expectation of privacy for individuals on probation). Probationers, for example, "do not enjoy the absolute

---

[5] In his post-hearing brief, Defendant appeared to narrow the scope of his motion by arguing that the "*work computer* and its contents must be suppressed as fruit of the poisonous tree." (Def.'s Mem. 5 (emphasis added).) However, the record seems to reflect that no pornographic images were recovered from the work computer. Instead, they were recovered from the so-called "client computer," the HP Pavilion. (*See* Gov't Resp. 4.) Since the record on this issue is not fully developed, this Court will treat Defendant's motion as seeking to suppress both of the seized computers and their contents.

liberty to which every citizen is entitled." *Knights*, 534 U.S. at 119. "Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *United States v. Makeeff*, 820 F.3d 995, 1000 (8th Cir. 2016). When, as here, an individual is released from prison subject to a search condition,[6] it "significantly diminishes [the] reasonable expectation of privacy." *Id.* (citing *Knights*, 534 U.S. at 120). "Probationary searches—whether for law enforcement or probationary purposes—are acceptable under *Knights* if based upon reasonable suspicion (or potentially a lesser standard)." *Id.* at 1001 (citing *United States v. Lifshitz*, 369 F.3d 173, 181 (2d Cir. 2004)). The reasonable suspicion standard for probationary searches has been applied to probationary searches and seizures of computers, phones, and other electronic devices. *See, e.g.*, *Makeef*, 820 F.3d at 1000–03 (finding reasonable suspicion to seize and search Universal Serial Bus (USB) drive from individual on supervised release); *United States v. Hamilton*, 591 F.3d 1017, 1023–24 (8th Cir. 2010) (finding reasonable suspicion to search computer of parolee, subject to search condition, for child pornography) (collecting cases).

Courts have noted that supervised release, parole, and probation "lie on a continuum. The most severe is 'supervised release,' which is . . . followed, in descending order, by parole, then probation." *Makeeff*, 820 F.3d at 1001 (citing *Lifschitz*, 369 F.3d at

---

[6] Standard Condition No. 13 provides: "The offender will submit at any time to an unannounced visit and/or search of the offender's person, vehicle or premises by the agent/designee." (Tr. 26; Gov't Ex. 2 at 2.)

181 n.4). This is because "federal supervised release, in contrast to probation, is meted out in addition to, and not in lieu of, incarceration." *Id.* (quoting *Samson v. California*, 547 U.S. 843, 850 (2006)). Similarly, Defendant's ten-year conditional release term under state law is a punishment that is imposed in addition to his term of incarceration. *See* Minn. Stat. § 609.343, subd. 2(c); Minn. Stat. § 609.3455, subd. 6(b) ("[W]hen the court commits an offender to the custody of the commissioner of corrections for a violation of section . . . 609.343 . . ., the court shall provide that, after the offender has been released from prison, the commissioner shall place the offender on conditional release for ten years."). Therefore, this case involves "the most circumscribed expectation of privacy." *Makeeff*, 820 F.3d at 1001; *see also United States v. Jackson*, 866 F.3d 982, 984–86 (8th Cir. 2017) (finding suspicionless search of supervised releasee's cell phone reasonable). Even so, this Court will presume that reasonable suspicion is the correct standard to employ.

Defendant's only challenge in this motion is to the search of his vehicle, resulting in the seizure of two computers. (*See generally* Def.'s Mem.) As a condition of his supervised release, Defendant agreed to "submit at any time to an unannounced visit and/or search of the offender's person, *vehicle* or premises by the agent/designee." (Gov't Ex. 2 at 2 (emphasis added).) Thus under *Knights*, the warrantless search of Defendant's vehicle was reasonable under general Fourth Amendment analysis if supported by reasonable suspicion that officers would discover evidence of a parole violation or a crime. *See Knights*, 534 U.S. at 118–20; *Makeeff*, 820 F.3d at 1001–02 (applying *Knights* analysis to individual on supervised release).

### B.   The Search of Defendant's Automobile Was Supported by Reasonable Suspicion

Reasonable suspicion exists when, considering the totality of the circumstances known to the officer at the time, the officer has a particularized and objective basis for suspecting wrongdoing. *Hamilton*, 591 F.3d at 1022. Because "ordinary Fourth Amendment analysis" applies to a probationary search, the parole officers' subjective purpose for the search is irrelevant, and courts look only at whether the officers' conclusion that reasonable suspicion existed was objectively reasonable. *Id.* This standard applies to criminal activity, in addition to violations of the terms of probation. *United States v. Becker*, 534 F.3d 952, 956 (8th Cir. 2008) ("When a probationer is subject to a probationary search condition, the Fourth Amendment permits an officer to search pursuant to that [probationary] condition without a warrant based only upon that officer's reasonable suspicion that the probationer is violating his probation's terms.").

In the particular context of probation—or in this case, conditional release—the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Makeeff*, 820 F.3d at 1000 (quoting *Knights*, 534 U.S. at 118–19).

> In assessing the governmental side of the balance, it must be remembered that 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.' The government's 'interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen.' . . . The degree of individualized suspicion necessary for 'a search is a determination of when there is a sufficiently high probability that

14

>criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable.' An officer having reasonable suspicion that a probationer, who is subject to a search condition, is criminally active is sufficient to establish 'enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.' 'The same circumstances . . . render a warrant requirement unnecessary.'

*Id.* at 1000–01 (quoting *Knights*, 534 U.S. at 120–21).

In November 2016, Officer James began noticing several potential red flags with Defendant's internet use. Officer James decided to confront Defendant about these issues by directing him to report to his office on November 29, 2016. When confronted, Defendant admitted to engaging in activities—such as the use of Facebook and Craigslist—that violated his supervised release conditions. Indeed, Defendant expressly admitted to using Facebook on his work computer, suggesting to Officer James that Defendant "had perhaps been misusing his work computer that had been authorized." (Tr. 34.)

After learning that internet-related violations had occurred, Officer James sought to confirm "what [Defendant's] Internet activity had been." (Tr. 37.) Officer James suspected that Defendant's use went beyond what he had been able to ascertain by inspecting Defendant's phone. As Officer James testified, there were "a lot of inconsistencies with what he was telling me and what I was seeing on the accounts. I believe I had actually seen a recent update through his e-mail account that was in close proximity to the time he arrived at my office," suggesting that there might be another device "in the vicinity" that Defendant had used for unauthorized Internet activity. (Tr. 37.) Officer James asked Defendant to lead him and two other probation officers to

Defendant's car, which was next door in a parking ramp, so they could recover Defendant's work computer. Officer James testified that Defendant "brought us right to the vehicle that he had driven there that day . . . . He opened up the vehicle. We asked him if there was any electronics inside. He indicated that there was. There was a work computer. I believe he actually retrieved that for us. He might have just indicated where it was." (Tr. 38.)

Thus, at the time of the search, Defendant had admitted to recently violating the terms of his supervised release regarding prohibited Internet use. There was also reason for the officers to believe that Defendant's work computer was located in the vehicle, which could contain evidence of further violations. The officers went to the car to retrieve his work computer, and Defendant expressly stated that the computer was inside the car before it was searched. As a result, the officers reasonably suspected that a search of the vehicle would result in the discovery of evidence that Defendant was violating his release conditions. The search, which resulted in the recovery of two computers, was reasonable. *See Hamilton*, 591 F.3d at 1023–24 (finding reasonable suspicion to search computer of parolee, subject to search condition, for child pornography) (collecting cases).[7, 8]

---

[7] Defendant's motion, as noted above, is focused on whether there was reasonable suspicion to search Defendant's car, not whether there was reasonable suspicion to search the computers found in the car. Searching the computers was reasonable for many of the same reasons, including Defendant's admission that he had used his work computer to conduct unauthorized Internet activities.

(Footnote Continued on Next Page)

## RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS HEREBY** **RECOMMENDED** that:

1.  Defendant's Motion to Suppress Search and Seizure Evidence (Doc. No. 20) be **DENIED**.


Date: November 28, 2017.                    *s/ Becky R. Thorson*_____
                                            BECKY R. THORSON
                                            United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **seven (7) days**. A party may respond to those objections within **seven (7) days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

---

(Footnote Continued from Previous Page)
[8]   The Government also argues that Defendant consented to the search. (*See* Gov't Suppl. Br. 16–19.) This Court finds it unnecessary to address the consent argument in detail, but would be inclined to conclude that a reasonable officer would believe that Defendant consented to the search of the car. *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009).